In the Matter of NEW CENTER HOSPITAL, Debtor.

Basil T. SIMON, Trustee, and United States of America, Plaintiffs,

v.

NEW CENTER HOSPITAL, Park Community Hospital d/b/a New Center Hospital, Central City Health Services, Inc., New Center Clinic—East, Inc., New Center Clinic—West, Inc., New Center Clinic—Central, Inc., Detroit Medical Health Facility, Inc., New Center Managed Care, Inc., Detroit Medical and Surgical Center, P.C., New Center Clinic—Central, Inc. d/b/a Central City Health Services Clinic, and Alfred Moore, Defendants.

Bankruptcy No. 93–44035–G.
Adv. No. 93–4683.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

July 18, 1994.

Lynn M. Brimer, Sp. Asst. U.S. Atty., Detroit, MI, for U.S.

Robert A. Weisberg, Birmingham, MI, for Basil T. Simon, Trustee.

Jay N. Siefman, Farmington Hills, MI, Eric B. Gaabo, Birmingham, MI, for Central City Health Services, Inc.

Jerome D. Frank, Farmington Hills, MI, for Center Clinic—East, Inc.

### MEMORANDUM OPINION GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

RAY REYNOLDS GRAVES, Chief Judge.

### Introduction

The United States of America on behalf of its agencies, the Internal Revenue Services and the Department of Housing and Urban Development, by and through the attorneys for the Eastern District of Michigan brought this motion pursuant to Fed.R.Civ.P. 56.

This matter is before the Court upon Plaintiff's, the United States', Motion for Summary Judgment, whereby Plaintiff seeks to substantially consolidate the estate of the debtor and its alleged alter egos. This case enjoys a tortured history of litigation that culminates with the granting of summary judgment in favor of the Plaintiff, the United States of America, for the reasons set forth below.

### Facts

The Debtor in this matter, New Center Hospital's, presence in this case began involuntarily. After mounting tax obligations owed to the United States and upon a seizure of certain books and records of the Debtor, the Debtor's largest creditor by its action caused the Debtor to seek the protection of the bankruptcy court by filing a chapter 11 petition.

After extensive discovery disputes, resulting in this court's orders to compel discovery and upon endless discovery, the United States filed its complaint seeking the sub-

stantive consolidation of the non-debtor defendants' assets into the debtor's chapter 11 bankruptcy estate.[1]

On July 6, 1983, Harold Murdock, Paul Davidson and Leonard Hyman incorporated Central City Health Services (CCHS). Murdock, Davidson and Hyman were members of the New Center Hospitals (NCH) Board of Trustees when CCHS was incorporated. On April 5, 1985, Tom Barrow, Harold Murdock and Paul Davidson incorporated New Center Clinic—East, Inc. (East), and New Center Clinic—Central Inc. (Central). On August 7, 1985, Barrow, Murdock and Davidson incorporated New Center Clinic—West, Inc. (West). (Hereinafter East, West and Central shall at times be referred to collectively as the "Clinics").

In January, 1986, with Board approval, NCH transferred approximately $1,200,000.00 to CCHS for the acquisition of clinics intended to feed patients to NCH. One of the clinics was Detroit Medical and Surgical Center, P.C. (DMSC), which operated out of the facilities located at 8300 Mack Avenue, Detroit, Michigan. After the acquisition, DMSC became New Center Clinic—East, Inc. A clinic, located within NCH's physical plant located at 801 Virginia Park, Detroit, Michigan, was also acquired. This became the Central clinic. Finally, a doctor's practice was purchased at a third location and established as the West clinic.

The following facts are crucial to the outcome of this case. Loan documents were never executed in connection with the transfer of monies by NCH to CCHS for the purchase of the Clinics. The NCH audited financial statements for the subsequent years identifying the transfers to CCHS for the purchase of the clinics as unsecured non-interest bearing loans to CCHS's parent company. Following the purchase of the clinics, NCH continued to transfer monies to CCHS. CCHS then transferred funds to the various clinics allegedly in order to finance their operations. The failure to repay the above stated loan obligation has been verified by deposition testimony.[2]

Since January of 1985, the defendants have been under the same management and control. During all years at issue, the defendants were all ultimately under the control of the same managing officer who took responsibility for the maintenance of the day-to-day operations and financial affairs of all defendants. Defendants essentially disregarded the corporate entities of the respective corporations in its operation of the hospital and clinics. The assets and operations of the defendants have been extensively commingled. As evidenced by the deposition testimony, money was transferred from NCH to CCHS whenever CCHS or the Clinics needed funding. Particularly troubling is the fact that after November, 1989, NCH engaged in banking activities which not only resulted in commingling of its funds with those of the other defendants, but apparently in an effort to defraud its creditors and to avoid the payment of its legal obligation.[3]

---

1. Plaintiff seeks to consolidate the estate of New Center Hospital, Park Community Hospital, d/b/a New Center Hospital, Central City Health Services, Inc., New Center Clinic—East, Inc., New Center Clinic—West, Inc., New Center Clinic—Central, Inc., Detroit Medical Health Facility, Inc., New Center Managed Care, Inc., Detroit Medical and Surgical Center, P.C., New Center Clinic—Central, Inc., d/b/a Central City Health Services Clinic, and Alfred Moore.

2. Moore stated that a $500,000.00 payment identified in a financial statement for 1986 was a return of the unused portion of the original transfer. There has not been payment by CCHS to NCH of funds generated by CCHS operations. Barrow, Murdock and Moore could not recall CCHS making any payments to NCH for the funds transferred for the purchase of the clinics.

3. For example, with Board approval, after its creditors began garnishing the NCH bank accounts, NCH transferred its money to an account maintained in the name of CCHS.
A levy or garnishment served upon a bank will only reach the accounts maintained in the name of the party whose liabilities are being collected. (Moore Dep.Vol. I, p. 100) Therefore a levy or garnishment served on a bank for the collection of NCH liabilities will not reach money maintained in an account in the name of CCHS.
It should also be noted that, in a further attempt to avoid the payment of its legal obligations, NCH opened checking accounts at the Huntington Bank and OMNI Bank after its creditors began serving garnishments and levies on Michigan National Bank. (Broach, Dep. pgs. 142–43) NCH also maintained its funds in the form of cashiers' checks in an effort to keep its funds free from garnishment and levy.

Other demonstrations of defendants acting in total disregard of the corporate entities is reflected by East maintaining its funds in an account in the name of DMSC, although DMSC was not an assumed name of East.[4] The checks on the Central account had the name Central City Health Services—Clinic, Inc., embossed on them. Central City Health Services—Clinic, Inc., was not an assumed name of Central.

Post-petition activity on the part of defendants continued this shameful conduct. Even after the filing of the bankruptcy, NCH continued to pay for the printing supplies for East. Creditors of both East and NCH maintained only one account on behalf of both entities. As evidenced by the retained consultant engaged to protect the interests of both NCH and East, charging only a single monthly retainer for the services provided to both East and NCH. There was no differentiation on the account for the services provided to East or for the services provided to NCH.

As the following examples highlight, the operations of the defendants were also extensively commingled. The Board of Trustees of East, West and Central were appointed by the CCHS Board. Four of the seven members of the Detroit Medical Health Facility Board of Trustees were appointed by CCHS. This collusive activity extended to defendants sharing certain employees. Certain NCH employees, specifically, a van driver and administrative assistant were shared by all defendants. Apparently, even the premiums for the physical plant located at 8300 Mack Avenue, ostensibly the East location, was mounted in the name of CCHS. Similarly, the automobile insurance for the vehicle used by the facility located at 8300 Mack Avenue was maintained in the name of DMSC.

### Discussion

 Rule 56(c) of the Federal Rules of Civil Procedure is incorporated into the bankruptcy practice by Fed.R.Bank. 7056. *See Cook v. United States (In re Earl Rog-*

genbuck Farms, Inc.)*, 51 B.R. 913 (Bankr. E.D.Mich.1985). Summary judgment is the proper means of adjudicating a case when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Laborers' Fringe Benefit Funds v. Kaltz (In re James J. Kaltz)*, 100 B.R. 871, 872 (Bankr.E.D.Mich. 1989). On such motion the court is called upon not to ascertain the facts, but only to determine whether there are any material facts in dispute. The burden is on the moving party to demonstrate that there are not material facts genuinely in dispute. In order to avoid the improper granting of the remedy, the Court is required to resolve all ambiguities and to draw all reasonable inferences in favor of the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153–61, 90 S.Ct. 1598, 1606–10, 26 L.Ed.2d 142 (1970).

A Motion for Summary Judgment is governed by the standards set forth in Bankruptcy Rule 7056 and Federal Rule of Civil Procedure 56(C). The Rule states that the movant will be entitled to summary judgment when:

> The pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

As stated by the court *In re Kaltz*, 100 B.R. 871, 872 (Bankr.E.D.Mich.1989), in adjudicating a Motion for Summary Judgment. "[T]he moving party must show conclusively that no genuine issue exists as to any material fact." *See also Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.) *cert. denied*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979); *Willetts v. Ford Motor Co.*, 583 F.2d 852, 854 (6th Cir.1978). The function of a Motion for Summary Judgment is not to allow the court to decide issues of fact but rather to determine whether there is an issue of fact to be tried. *United States v. Articles of Denial Device, etc.*, 527 F.2d 1008, 1011 (6th Cir.

---

4. The withholding liabilities for East accrued under the East employer identification number. If the IRS served a levy upon the area banks for collection of the East liabilities, it would not

reach an account maintained in the name of DMSC. The same would be true for judgment creditors of East serving garnishments for the collection of their judgments.

1976); *Aetna Insurance Co. v. Cooper Wells & Co.*, 234 F.2d 342, 345 (6th Cir.1956). If a disputed question of material fact is remaining, the Motion for Summary Judgment must be denied. *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 908 (6th Cir.1982); *Felix v. Young*, 536 F.2d 1126, 1136 (6th Cir.1976).

In 1986, the Supreme Court ushered in a "new era" in summary judgment proceedings when it decided the three cases of *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Sixth Circuit recognized the drastic change these cases bring to the analysis of summary judgment proceedings as a "salutary return to the original purpose of summary judgments." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989).[5]

■ In the Sixth Circuit, the law is well settled, a material fact is "genuine" if a reasonable fact finder, in assessing the evidence, could possibly return a verdict for the non-moving party. See *Bohm v. Forum Resorts, Inc.*, 762 F.Supp. 705, 707 (E.D.Mich.1991).

■ Prior to granting Summary Judgment, this Court must scrutinize all the facts and conclude that in accordance with the applicable substantive law, that no reasonable fact finder could grant Summary Judgment for the non-moving party. The absence of a genuine issue of material fact dictates the granting of Summary Judgment.

■ Substantive consolidation is the merger of two or more apparent entities into a single estate. The assets and liabilities of two or more entities are consolidated into a common fund of assets and a single body of creditors. *In re Cooper*, 147 B.R. 678, 682 (Bankr.D.N.J.1992). The purpose of the substantive consolidation is the equitable distribution of the debtor's property among all its creditors. *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir.1988).

■ The Bankruptcy Court has the jurisdiction to order a substantive consolidation pursuant to its equitable powers granted in section 105(a) of the Bankruptcy Code.[6] Although the section does not specifically authorize the consolidation of the assets of a non-debtor with the estate of a debtor, Courts have recognized this as a valid application of § 105(a). *Munford, Inc., d/b/a/ Majik Market v. Toc Retail, Inc. (In re Munford, Inc.)*, 115 B.R. 390 (Bankr.N.D.Ga. 1990); *See also, Auto–Train Corp. v. Midland–Ross Corp.*, 810 F.2d 270, 276 (D.C.Cir. 1987); *see generally, In re Walway Co.*, 69 B.R. 967 (Bankr.E.D.Mich.1987); *United States v. Fairfield Construction Co. (In re Fairfield Construction Co.)*, 1991 Lexis 1395.[7]

**5.** The Court in *Street*, 886 F.2d at 1479–80 set forth several principles to be found in the Supreme Court decisions applicable in this "new era" of summary judgment, including the following:
 1. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.
 2. Complex cases are not necessarily inappropriate for summary judgment.
 3. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.
 4. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.
 5. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
 6. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.

**6.** Section 105(a) provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

**7.** *See also Sampsell v. Imperial Paper Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 *reh'g denied*, 313 U.S. 600, 61 S.Ct. 1107, 85 L.Ed. 1552 (1941) (where the court recognized the

■ The corporate veil does not exist between the entities and must be disregarded. A debtor must not be accorded the protections of a corporate entity if the debtor itself has ignored the integrity of the corporation and has operated independent of the protections guaranteed to a corporate entity. Although the Sixth Circuit has not pronounced a standard for the allowance of substantive consolidation of two or more entities into a single estate, we may look to other circuits for guidance.

At least two general tests have been articulated in other circuits. See *In re Standard Brands Paint Co.*, 154 B.R. 563, 567–69 (C.D.Cal.1993). The first test was articulated by the D.C. Circuit in *In re Auto–Train Corp., Inc.*, 810 F.2d 270, 276 (D.C.Cir.1987). The Auto–Train standard relies upon a three part analysis:

1. The proponent must show a substantial identity between the entities to be consolidated, and

2. The proponent must show that consolidation is necessary to avoid some harm or to realize some benefit, and

3. If a creditor objects and demonstrates that it relied upon the separate credit of one of the entities and that it will be prejudiced by the consolidation, then the court may order consolidation only if it determines that the demonstrated benefits of consolidation "heavily" outweigh the harm.

The first prong of the test involves an analysis similar to that used by the Courts to determine whether corporations are the alter egos of one another. The second and third prongs require a balancing of the equities or benefits and harms of the substantive consolidation. *Standard Brands*, 154 B.R. at 569.

The second test was enunciated by the Second Circuit in *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, supra. The *Augie/Restivo* test identifies two critical factors for the determination: "(i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate

identity in extending credit' (citations omitted) or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518; *see also, Standard Brands Paint Co., supra; Munford, Inc., supra.* Under this approach, the court looks to the treatment of the entities by creditors, or alternatively, to the complexity of the inter-relationship of the entities. The determination is a fact intensive case-by-case analysis.

Traditional alter ego analysis is applicable to both tests. "Efforts to disregard corporate entities under equitable doctrines, 'mere instrumentality rule' and 'alter ego,' are frequently interposed in bankruptcy proceedings." *In re David A. Crabtree*, 39 B.R. 718, 723 (Bankr.E.D.Tenn.1984) (quoting *In re G & L Packing Co.*, 20 B.R. 789, 804–805 [Bankr.N.D.N.Y.1982]). The Court in *In re Cooper*, 147 B.R. at 683, stated that "[a]n alter ego relationship ordinarily weighs heavily in favor of both piercing the corporate veil and substantive consolidation." During the course of hearings to bring both testimony from a trades creditor who indicated that they never treated the clinic or hospital as one entity. However, the court is not persuaded by one creditor's unremarkable assertions.

### Michigan Law

■ In Michigan piercing of the corporate veil has long been upheld. Under Michigan law, courts will "pierce the corporate veil" and look behind the corporate structure to ascertain the true situation when the corporate entity has been used as a sham to avoid legal obligations. *Symington, Inc. v. United States*, 89–1 U.S.T.C. ¶ 9113 (D.C., E.D.Mich.1988). The Michigan Supreme Court has a long history of recognition of the doctrine of "piercing the corporate veil." In *Charles E. Austin, Inc. v. Secretary of State*, 321 Mich. 426, 32 N.W.2d 694 (1948), the Court held that "the separate existence of ... two corporations will be ignored and

authority of the Bankruptcy Court to order the consolidation of the bankruptcy estate with the estate of a non-debtor).

both will be regarded as one where they are so organized and carried on that one is a mere instrumentality or agent or adjunct to the other." 321 Mich. at 434, 32 N.W.2d 694; *See also, Wells v. Firestone Tire & Rubber Co.*, 421 Mich. 641, 650–51, 364 N.W.2d 670 (1985) (the doctrine of piercing the corporate veil is typically applied to protect a corporation's creditors where the corporate entity has been used to avoid legal obligations). The Sixth Circuit has set forth the general principles of corporate law and alter ego analysis under Michigan law as follows:

> '[T]he general principle in Michigan is that separate corporate identities will be respected, and thus corporate veils will be pierced only to prevent fraud or injustice.' (citations omitted) '[F]raud or other attempts to evade the law justify invoking equity's power to look through and behind the legal entity of corporate existence.' (citations omitted) 'The entire spectrum of relevant facts form the background for such an inquiry, and the facts are to be assessed in light of the corporations's economic justification to determine if the corporate form has been abused.' (citations omitted) 'Each case must be decided on its own facts.' (citations omitted)

*Bodenhamer Building Corp. v. Architectural Research Corp.*, 873 F.2d 109, 111 (6th Cir. 1989). Relying on Judge Zatkoff's opinion, the *Bodenhamer* court stated that the corporate veil may be pierced when: "(a) a corporation and shareholders have complete identity of interest; (b) the corporation is a mere instrumentality of the shareholders; (c) the corporation is a device to avoid legal obligation; or (d) the corporation is used to defeat public convenience, justify a wrong, protect fraud or defend a crime." *Id.*, at 112.

The Sixth Circuit has also identified relevant factors to finding an alter ego under federal labor law, including such factors as "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership." *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir.

1986).[8] The Court in *Allcoast Transfer* further found that intent is not essential to an imposition of alter ego status and that "the essential inquiry under alter ego analysis is '[w]hether there was a *bona fide* discontinuance and true change of ownership ... or merely a disguised continuance of the old employer.'" *Id.*, at 581 (citing *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718 [1942]); *see also, United States v. Fairfield*, 1991 Lexis 1395 at p. 6.

■ In the case *sub judice*, the facts indicate that the defendants are at times mere instrumentalities of one another, and there is sufficient indicia of unity between the corporations to support a finding that they are the alter egos of one another under both the Michigan and federal standards. Applying the standards necessary in piercing the corporate veil to the facts in this case, we find (a) the assets, particularly the revenues, and operations of the entities have at times been commingled as identified in the Motion for Summary Judgment; (b) CCHS was clearly an instrumentality of NCH in that CCHS served as nothing more than a conduit for the transfer of revenue from NCH to the Clinics, or as a haven for NCH to shield its funds from creditors; (c) CCHS was utilized by NCH as a device to avoid the payment of its legal obligations as identified in the use of CCH's bank account by NCH to avoid garnishments and levies. East and Central used fictitious names on their bank accounts as well. Presumptively this was also intended as a device to avoid the claims of their legal creditors; (d) based upon the facts as identified, the corporate structure was used by NCH and its management in an effort to perpetrate and conceal a fraud on the entire enterprises' legal creditors.

Similarly, under the federal standard set forth in *Allcoast Transfer*, a finding that the defendants are alter egos of one another is justified. While it is true that all of the entities have been under substantially the

---

8. It is interesting to note that the Court in *Allcoast Transfer* stated that "we conclude that a finding of employer intent is not essential or prerequisite to imposition of alter ego status."

780 F.2d at 581. *See also, Laborers' Pension Trust Fund—Detroit and Vicinity v. Family Cement Co.*, 677 F.Supp. 896 (E.D.Mich.1987).

same management, control and supervision since 1985, the assets and operations of the defendants were extensively commingled creating a unity of operations, assets and business purpose.

■ The management of the various defendants has been unclear at times regarding the relationship between the defendants. Moreover, plaintiff has provided this court with a myriad of examples as to the disregard of the corporate veil, although many of the incidents are isolated and standing alone are insufficient to make a case for an alter ego. In light of all the evidence, however, plaintiff has sufficiently established that defendants acted as an alter ego. It is true that proper corporate form was not observed and some commingling of assets transferred. Blatant disregard for the integrity of the respective corporate entities is sufficient enough reason to find that substantive consolidation is appropriate.

### Substantive Consolidation

■ This court may determine that substantive consolidation is warranted if many critical elements as annunciated pursuant to *Augie/Restivo*, 860 F.2d at 518 are met. Under this analysis, based on the relationship of the entities, a seven-part objective inquiry into the inter-relationship of the entities is delineated as follows:

(1) presence or absence of consolidated business or financial records;

(2) unity of interest and ownership between the debtors;

(3) the existence of parent and intercorporate guarantees on loans;

(4) degree of difficulty in segregating and ascertaining separate assets and liabilities;

(5) existence of transfers of assets without observance of corporate or other legal formalities;

(6) commingling of assets and business functions; and

(7) the profitability of consolidation at a single physical location.

*In re Murray Industries, Inc.*, 119 B.R. 820, 829 (Bankr.M.D.Fla.1990); *see also, In re Crabtree*, 39 B.R. 718 (Bankr.E.D.Tenn.

1984); *In re Gainesville P–H Properties, Inc.*, 106 Bankr. 304 (Bankr.M.D.Fla.1989).

■ The inter-relationship need not be an entanglement of the financial affairs and records of the entities which are to be consolidated. In *Standard Brands Paint Co.*, 154 B.R. at 572, with respect to this aspect of the analysis, the Court noted that:

[T]he debtors function as a consolidated entity, and there are multiple interdebtor guarantees, and interdebtor debts. (reference omitted) Thus in a functional sense the affairs of all five debtors are so entangled that consolidation will benefit all creditors, because the effect/validity of all these intercompany debts and guarantees will not have to be sorted out by the parties or court.

Clearly the Court recognized that, even if the financial relationships among the parties to be consolidated are capable of being untangled, the affairs of the parties may nonetheless be "inextricably intertwined." If intercompany debts and transfers are numerous and the operations are interdependent, the parties are "entangled" even if a detailed analysis of the records could ultimately identify the true assets and liabilities of the separate entities.

■ In the case at bar, sufficient indicia of unity and entanglement are present, making the affairs of the defendants so inextricably intertwined that untangling the affairs is either impossible or so costly as to consume the assets of the estate. *See Standard Brands Paint Co., supra; Augie/Restivo*, 860 F.2d at 519. All of the facts supporting the contention that the business affairs of the defendants have been intertwined. The record, as previously recited and in the motion, establishes that elements (2) through (7) of this analysis are met. The record relating to the financial records of the defendants and the intercompany transfers indicate that the financial affairs of the defendants are hopelessly intermingled. The financial records of the defendants appear to be inherently unreliable. There are insufficient records from which the estate or this Court could determine with certainty and accuracy the amount of the debt running between the defendants.

In order to achieve an equality of distribution among the creditors the equities require that the nondebtors be substantively consolidated into this bankruptcy estate. The plaintiffs have met the standard for substantive consolidation.

### The Order of Substantive Consolidation Should issue *Nunc Pro Tunc*

The order of substantive consolidation in this case should be issued *nunc pro tunc.* The most recognized standard for determining the propriety of a retroactive order of substantive consolidation was identified in *Auto–Train, supra,* where the Court stated that "a court should enter a consolidation order *nunc pro tunc* only when it is satisfied that the use of *nunc pro tunc* yields benefits greater than the harm it inflicts." 810 F.2d at 277; *See also, Kroh Brothers Development Co. v. Kroh Brothers Management Co., (In re Kroh Brothers Development Co.),* 117 B.R. 499 (W.D.Mo.1989).

The Sixth Circuit has declined to adopt the *Auto–Train* analysis. In *First National Bank of Barnesville v. Rafoth (In re Baker & Getty Financial Services, Inc.),* 974 F.2d 712, 721 (6th Cir.1992), the order of substantive consolidation issued *nunc pro tunc* on the grounds that the order "rests on the foundation that the assets of all of the consolidated parties are substantially the same." The essence of the Court's ruling was that when two or more entities are substantively consolidated on grounds giving rise to an inference that the assets of one have always been the assets of the other the order should issue *nunc pro tunc.* In other words, the assets have always been subject to this pooling and the order or substantive consolidation is merely recognizing this fact.

■ In the instant case, under the standard of *Auto–Train,* the order should issue *nunc pro tunc* because the benefit to the creditors will outweigh any harm the retroactive order might inflict. The largest creditor of each of the defendants is the United States or one of the other defendants. There is no harm to issue to the creditors of the defendants if the order is retroactive.

### *Conclusion*

This court finds that substantive consolidation of the debtor corporation and defendants are warranted as the corporate veil for each corporation is disregarded and the respective entities acted as one. This court is empowered to consolidate the estate in an effort to equitably distribute the debtors' assets.